## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLAINTIFFS UNDER SEAL | **Civil Action No.** |
| v. | |
| DEFENDANTS UNDER SEAL | **FILED *IN CAMERA* UNDER SEAL**<br>**Pursuant to 31 U.S.C. § 3730(b)(2)** |
| | **JURY TRIAL DEMANDED** |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ.

Stephen A. Weiss
James A. O'Brien
SEEGER WEISS LLP
77 Water Street, 26th Floor
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

Michael F. Bachner
Bachner & Associates PC
39 Broadway, Suite 1610
New York, NY 10006
Telephone: (212) 344-7778
Facsimile: (212) 344-7774

*Counsel for Plaintiff/Relator*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALAN BRAND, | )<br>)<br>) |
| Plaintiffs, | ) **FILED *IN CAMERA* UNDER SEAL**<br>) **Pursuant to 31 U.S.C. § 3730(b)(2)** |
| v. | )<br>) **Civil Action No.** |
| MIROMEDICAL, P.C.; LAWRENCE T. CHIARAMONTE, MD; NATALIA DOCHIM; FELICITAS G. AMADOR, MD; ARISTIDE BURDUCEA, DO; KARL CIRINCIONE, DPM, JOSEPH F. DORSTEN, DO; CLARISSE D. CLEMONS FERRARA, MD; SAWEY ABDELKHALEK HARHASH, MD; JONATHAN C. LAQUI, PT; MUJIBUR MAJUMDER, MD; JEAN MARIE YVES CARL SAINT-PREUX, MD; ILYA MARK SMUGLIN, MD; and SANDY WEEKES, FNP. | )<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

---

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 ET SEQ.

Stephen A. Weiss
James A. O'Brien
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Telephone: 212-584-0700
Facsimile: 212-584-0799
Michael F. Bachner
Bachner & Associates PC
39 Broadway, Suite 1610
New York, NY  10006
Telephone:  (212) 344-7778
Facsimile:  (212) 344-7774

*Counsel for Plaintiff/Relator*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

        A.      Federal Law Claims ................................................................................ 1

II.     SUMMARY OF ALLEGATIONS ...................................................................... 2

III.    ALLEGATIONS OF DEFENDANTS' FRAUDULENT SCHEME ................ 6

IV.     JURISDICTION, VENUE, AND SPECIAL REQUIREMENTS ................... 18

V.      THE PARTIES ................................................................................................. 19

VI.     GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT .................... 22

        A.      The False Claims Act ............................................................................ 22

        B.      Federal Government-Funded Health Assistance Programs .................. 24

                1.      Medicare ................................................................................... 24

                2.      Medicaid ................................................................................... 24

                3.      General Provisions Applicable to Medicare ............................. 25

                        a.      The Anti-Kickback Statute Ensures Integrity of Underlying
                                Conduct. ...................................................................... 25

                        b.      The Stark Law ............................................................. 27

                        c.      New York State Laws and Regulations Governing the
                                Provision of Addiction Treatment. .............................. 28

                        d.      Prohibitions Against Claims for Services that are Not
                                Medically Necessary or are Otherwise False or Fraudulent ......... 31

VII.    THE GOVERNMENT HAS BEEN DAMAGED AS A RESULT OF
        DEFENDANTS' CONDUCT ............................................................................ 32

VIII.   CLAIMS FOR RELIEF .................................................................................... 35

FIRST CAUSE OF ACTION (False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A)) ......................................................................................... 35

SECOND CAUSE OF ACTION (False Claims Act: Making or Using False
Record or Statement to Cause Claim to be Paid) (31 U.S.C. § 3729(a)(1)(B)) ............ 36

i

THIRD CAUSE OF ACTION (False Claims Act: Making or Using False
Record Or Statement to Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(1)(G)) ..................................................................................37

FOURTH CAUSE OF ACTION (False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(1)(C)) ..................................................................................37

FIFTH CAUSE OF ACTION (Violations of Anti-Kickback Statute)
(42 U.S.C. § 1320a-7a) ..........................................................................................38

IX.      DEMANDS FOR RELIEF ...........................................................................38

TRIAL BY JURY ..................................................................................................39

## I.   INTRODUCTION

1.      On behalf of the United States of America, Plaintiff/Relator, Alan  Brand

("Relator"), by and through his attorneys, files this qui tam action against Defendants,

Miromedical, P.C. ("Miromedical"); Lawrence T. Chiaramonte, MD; Natalia Dochim;  Felicitas

G. Amador, MD; Aristide Burducea, DO;  Karl Cirincione, DPM; Joseph F. Dorsten, DO;

Clarisse D. Clemons Ferrara, MD;  Sawey Abdelkhalek Harhash, MD; Jonathan C. Laqui, PT;

Majumder Mujibur, MD; Jean Marie Yves Carl Saint-Preux, MD; Ilya Mark Smuglin, MD; and

Sandy Weekes, FNP (collectively, "Defendants"), and alleges as follows:

### A.   Federal Law Claims

2.      Relator brings this action to recover double and treble damages and civil penalties

on behalf of the United States of America in connection with an intentional scheme by

Defendants to defraud the federal Medicare program by bribing and otherwise inducing patients

to patronize the Miromedical addiction-treatment and medical clinic (and/or related entities), by

billing for services not fully and properly rendered there (or not rendered at all) and/or which

were not medically reasonable and necessary, and for creating, altering, or otherwise keeping

false and fraudulent medical documentation, in violation of the Anti-Kickback Act, 42 U.S.C.

§1320-7b(b) (the "AKA"), the Stark Law, 42 U.S.C. § 1395nn, and the False Claims Act, 31

U.S.C. §§ 3729 et seq. (the "FCA").

3.      Specifically, this action arises from the conduct of Defendants who:  (a) made,

used or presented, or caused to be made, used or presented, certain false or fraudulent statements,

records and/or claims for payment or approval to federally-funded health insurance programs;

and/or (b) made, used or caused to be made or used false records or statements to conceal, avoid,

or decrease an obligation to pay or transmit money to the federal government in connection with

Medicare benefits, all in violation of the FCA, the AKA, and the Stark Law.  The false or fraudulent claims, statements and records at issue involve payments made by health insurance programs funded by the federal government, including Medicare.

## II.    SUMMARY OF ALLEGATIONS

4.      Miromedical purports to operate as a legitimate outpatient substance abuse treatment clinic specializing in addiction medicine and pain management.   Most addiction treatments are designed to reduce or remove drug use among those being treated, as well as to promote improved lifestyles and core life values as a means of insulating against continued drug use or future relapse.

5.      Treatments for drug addiction in the United States frequently center on the use of opioids.  Although opioids include the illicit drug heroin, they also include a variety of prescription pain relievers such as oxycodone, hydrocodone, codeine, morphine, fentanyl and others.

6.      Opioids produce pleasurable effects and relieve pain.  When administered and monitored properly by trained medical physicians as part of a responsible medical regimen, opioids can be an effective tool in the treatment of drug addiction.  When administered without appropriate oversight and monitoring by untrained medical staff, they can cause dangerous medical consequences.  Because of their prolific use in the treatment of drug addiction, opioids have held a stranglehold on drug addicts in the U.S.

7.      The majority of drug overdose deaths (more than six out of ten) involve an opioid.

8.      Suboxone® (a brand name form of buprenorphine) is an opiate or opioid-replacement prescription drug that can reduce the cravings and symptoms of withdrawal that are associated with opioid/opiate addiction.  It is administered to those who are addicted to opiates

with the objective of tapering a person off the drug gradually so he or she can become free from opiate addiction without withdrawal sickness.  As administered, many people are maintained on the drug for long periods, often dangerously.

9.      Against the backdrop of mounting opioid addiction, which has risen to a national epidemic and claimed almost 19,000 American lives in 2014 (approximately 52 deaths per day), there is a dire need for quality addiction treatment in the United States.  Many authorized treatment facilities have emerged to address this void in quality medical care, principally relying on the fiscal support of state and federal health and welfare programs.  Some, however, have been formed in order to exploit the market opportunity to profit from these government programs.  Miromedical is one such facility created to opportunistically enrich its owners through payments from the Federal Medicare and State Medicaid programs.

10.     Miromedical operates as an unauthorized substance abuse clinic in a low income neighborhood of New York City and preys on those addicted to heroin, methamphetamine, and other opioid drugs.  Miromedical's strategy is to lure its addicted clientele into a repeating cycle of detoxification and addiction using opiate or opioid-replacement drugs such as Suboxone®, in order to generate substantial fees, profits, and kickbacks that are a drain on the public fisc, in violation of the New York FCA.

11.     Under the direct supervision and control of its Director or Manager, Natalia Dochim, Miromedical in fact functions as a massive scheme to defraud the government by recruiting off the street vulnerable and desperate drug addicts to the clinic for treatment and then fraudulently billing Medicare for unnecessary or unauthorized services (or otherwise misrepresenting the treatment provided to clients in order to fraudulently obtain Medicare reimbursements from the federal government), and profiting through kickbacks and

reimbursements that Dochim and Defendants receive illegally through the scheme.  Miromedical in facts operates as an unauthorized outpatient substance abuse clinic, given that it lacks a license or certification to do so under New York's regulations governing Chemical Dependence Outpatient and Opioid Treatment Programs, namely, Article 28 and Part 822, 14 NYCRR Parts 810, 822 and 853.

12.    Many patients of Miromedical are former (and current) heroin and opioid addicts who come to Miromedical to obtain its opioid pain medicine; others are homeless or otherwise vulnerable individuals recruited by "runners" employed by Miromedical, who use incentives such as food or other provisions.  Miromedical then bills Medicare for health care services, many of which are either improper, unauthorized, unnecessary, or fraudulently performed.

13.    Relator Alan Brand saw the fraud first-hand as a consultant hired by Dochim to assist her in seeking to obtain the necessary license and certification in order to operate Miromedical as an Article 28 and Part 822 OASAS outpatient substance abuse treatment clinic, pursuant to 14 NYCRR Parts 810, 822 and 853.  Dochim's reliance upon Relator is entirely understandable, given that Relator's experience in, and knowledge of, outpatient substance abuse treatment in New York City is substantial.  He was the sole member and Chief Executive Officer of Narco Freedom, Inc., a not-for-profit corporation that provided outpatient programs at ten locations in Brooklyn, Queens, and the Bronx (and which included 18 "Freedom Houses" in the Bronx, i.e., housing offered to individuals seeking or enrolled in Narco Freedom's outpatient programs).  Narco Freedom, created in 1971, was licensed and certified to operate under Article 28 and Part 822 OASAS.

14.    Relator on many occasions also personally observed scores of patients appear at Miromedical each day to get doses of Suboxone®.  Suboxone® is dispensed (and reimbursed by

Medicare and other programs) as a safe heroin and opioid substitute for people recovering from addiction, to prevent or curb withdrawal effects and calm cravings.  However, many if not most of the Miromedical patients were current addicts who used Suboxone® as a "bridge" between heroin fixes.  For a current addict to take Suboxone®, or for a Suboxone® patient to take heroin, can be extremely harmful, and for that reason use of heroin and/or other drugs (alcohol) is forbidden for patients in rehab on Suboxone.

15.      The risk of severe negative effects, including overdose, is higher if the patient does not receive enough buprenorphine and continues to take other drugs.  Suboxone® overdose can be fatal, particularly if the patient injects this drug while also taking sedatives, tranquilizers or alcohol.  Unconsciousness, severe respiratory depression and death can occur.  Indeed, one of the primary effects of Suboxone is respiratory suppression (any opiate has this effect)—which is why an opiate overdose can kill someone.   Life-threatening overdose also can result from taking excessive amounts of Suboxone® orally or combining oral Suboxone® with alcohol, sedatives, tranquilizers, certain antidepressants and other opioid medications.

16.      For nearly all patients receiving Suboxone®, Miromedical personnel would systematically create false records as if these patients had received evaluations, counseling, therapy, or medical treatment on the same day that they received their Suboxone®.  For those who did actually receive counseling or treatment, it was unnecessary, unauthorized or, in many cases, counseling sessions were abbreviated, or the medical treatment or psychological "therapy" was incomplete, or the sessions or treatments were reported and billed in amounts (i.e., 60 patient treatments or sessions a day) far in excess than what actually occurred.

17.      Besides all of the "counseling" and "treatment" that Medicare paid for but was never rendered (or, if it did occur, was reimbursed for amounts in excess of what actually

occurred), Defendants also caused Miromedical patients to submit to services that were not necessary or authorized but for which Medicare paid.

18.     Defendants' scheme also violates New York law prohibiting fee splitting between physicians and non-physicians.  An Article 28 facility may lawfully share the fees generated by it with its physician-employees for services that they provide within the scope of the facility's operating certificate.  But Miromedical never obtained an operating certificate as required by New York law, and hence lacks the legal authorization to split fees generated by its physician-employees.  By billing physicians associated with Miromedical or one of Dochim's medical supply businesses at an artificially high rate, and/or covering various management services, and sharing revenues with the Defendants, the Defendants engage in illegal fee splitting.

## III.    ALLEGATIONS OF DEFENDANTS' FRAUDULENT SCHEME

19.     Miromedical advertises itself as "a Family Medicine Doctor . . . primarily specializ[ing] in Family Medicine but also specializ[ing] in . . . Allergy & Immunology [and] Family Medicine."  http://www.docbios.com/doc/family-medicine/miromedical-pc-new-york-ny-1003120619 (last visited Mar. 16, 2016).

20.     Miromedical was incorporated in New York on September 9, 2010 and its principal and registered agent is Lawrence T. Chiaramonte.

21.     As per its National Provider Identifier ("NPI"), NPI No. 1003120619, the address of Miromedical is 2364 Frederick Douglass Blvd., New York, NY 10027, which is also synonymous with 2364 8th Avenue, New York, NY 10027, and which is at or near the intersection with 127th Street in Harlem.

22.     Also located at 2364 Frederick Douglass Blvd., New York, NY 10027 is Allergy and Immunology Plus Family Health P.C., which lists Lawrence T. Chiaramonte as its Medical Director, as set forth by its "National Provider Identifier" information (NPI No. 1619290160).

23.     Lawrence T. Chiaramonte, MD (NPI No. 1699885327) lists his address as 170 West 233rd Street, Bronx, New York 10463.  He also lists addresses at 1065 Southern Blvd., Bronx, NY 10459, 624 East Fordham Road, Bronx, New York 10458.

24.     The Director or Manager of Miromedical is Natalia Dochim.

25.     Dochim is also the president of Cure & Care, Inc. ("Cure & Care") (NPI No. 1144650524), and Rosdo, Inc. ("Rosdo") (NPI No. 1205116563), both New York corporations that share the same address as Miromedical (2364 Frederick Douglass Boulevard, New York, New York 10027).

26.     Cure & Care is a supplier of prosthetic/orthotic products, and durable medical equipment and medical supplies.

27.     Rosdo is a supplier of portable x-ray and/or other portable diagnostic products.

28.     The address listed for acceptance of service of process for Rosdo, as set forth by the records of the New York Department of State, is 25 Bay 31st Street, Apt. 6, Brooklyn, New York 11214. Wasim Ghani, MD (specializing in urology and emergency medicine) is listed as associated with Rosdo at its 2364 Frederick Douglass Boulevard address.

29.     Verado, Inc. ("Verado") is a business with its address listed as 25 Bay 31st Street, Apt. #6, Brooklyn, New York 11214, by the records of the New York Department of State.

30.     Miromedical employs a number of physicians and at least one physical therapist and one nurse practitioner, including:  Felicitas G. Amador, MD (specializing in internal medicine, addiction medicine, and psychiatry); Aristide Burducea, DO (specializing in pain

management); Karl Cirincione, DPM (specializing in podiatry); Joseph F. Dorsten, MD

(specializing in diagnostic radiology);  Clarisse D. Clemons-Ferrara, MD (specializing in family

and emergency medicine);  Wasim Ghani, MD (specializing in urology); Sawey Abdelkhalek

Harhash, MD (specializing in physical medicine, rehabilitation and pain management); Jonathan

C. Laqui, PT (specializing in physical therapy);  Majumder Mujibur, MD (specializing in sleep

medicine and pulmonary disease); Jean Marie Yves Carl Saint Preux, MD (specializing in

psychiatry); Ilya Mark Smuglin, MD (specializing in internal medicine); and Sandy Weekes,

FNP, a family nurse practitioner and clinical nurse specialist.

31.     New York Health Insurance provider lists that confirm that Drs. Clemons-Ferrara

and Cirincione work at 2364 Frederick Douglass Boulevard. include the WellCare Advocate

Complete FIDA 2016 Medicare-Medicaid Provider Directory (New York)

https://fida.wellcareny.com/WCAssets/newyorkfida/assets/nyfida_directory_newyork

_eng_01_2016.pdf  (last visited Mar. 17, 2016).  Other online sources confirming that Drs.

Amador, Cirincione, Dorsten, Ghani and Harhash work for Miromedical include

http://www.carebulletin.com/ny/group1658569454.php (last visited Mar. 17, 2016); the Empire

Winter 2016 Managed Long-Term Care Provider Directory (as to Drs. Cirincione and Laqui),

https://mediproviders.empireblue.com/Documents/ NYNY_LTC_ ProviderDirectory.pdf (last

visited Mar. 17, 2016); and the 2015 Metroplus Health Plan (as to Dr. Ghani),

http://www.metroplus.org/getattachment/Provider-Services/Provider-Directories/MP_

Medicare_Directory_Eff_Feb2015.pdf (last visited May 9, 2016).

32.     Working out of rented space provided by Dochim, these physicians, with the

assistance of the physical therapist and a nurse, are paid for their services by Miromedical.  Each

physician sees approximately 65 patients per day.   The physicians, in turn, pay Dochim a

"management service fee," which is, in actuality, a kickback.  Fully sixty percent of what the
physicians receive by Miromedical is handed over to Dochim.

33.　　Examples of payments by Miromedical to some of the physicians employed as
part of the scheme, between January 1 and October 29, 2015, include the following:

> ➢　Dr. Clemons-Ferrara:  31 payments (including 18 payments each in the
> amount of $8,000) totaling $195,600;

> ➢　Dr. Amador:  17 payments in the amount of $960, 5 payments in the
> amount of $640, and 1 payment in the amount of $1,440, for a total of
> $20,960;

> ➢　Dr. Saint Preux:  19 payments (including 14 payments each in the amount
> of $1440) totaling $25,080;

> ➢　Dr. Laqui:  22 payments totaling $129,952;

> ➢　Dr. Smuglin:  10 payments totaling $49,024;

> ➢　Dr. Dorsten:  10 payments totaling $45,552;

> ➢　Sandy Weekes: 7 payments totaling $31,120; and

> ➢　Dr. Burducea:  8 payments totaling $11,400.

34.　　Under the direct supervision and control of its Manager/Director, Natalie Dochim,
Miromedical in fact functions as a patient mill designed to defraud the government by recruiting
vulnerable and desperate drug addicts, alcoholics, parolees, homeless and others to the clinic for
treatment, and then, overbilling for services, billing for services not rendered, unauthorized or
unnecessary, and otherwise misrepresenting the treatment provided to clients and the
Government in order to fraudulently obtain Medicare reimbursements.  Dochim and Defendants
then profit through kickbacks and reimbursements that they receive illegally through the scheme.

35.　　Many patients of Miromedical are former (and current) heroin and opioid addicts
who come to Miromedical solely to obtain Suboxone®, which is the trade name for

buprenorphine and naloxone, a medication which when used properly eases withdrawal symptoms from opiate drugs such as Vicodin, heroin, codeine, morphine, and OxyContin; others are parolees and ex-convicts recruited virtually at the jailhouse gate upon their release; still others (many homeless) are simply accosted on the street and given cash to show up at the clinic.

36.     Medicare usually covers drug addiction detoxification services.

37.     It is illegal for medical facilities that receive Medicare reimbursements to pay recruiters to bring them patients, but that is what Miromedical did.  Miromedical paid and/or pays "runners" or recruiters kickbacks in the form of thousands of dollars to recruit addicts from off the streets and steer them to Miromedical.  The "runners" or "recruiters" include, among others, Peter Garcia, Ashley Khan, Riddick Bowe (the former professional heavyweight boxing champion), and an individual named "Waterman."  Dochim hired the recruiters to find and refer patients, and approved of the recruiting of the patients who came to Miromedical for treatment. She authorized the payment of kickbacks to the recruiters to induce them to locate and refer patients to Miromedical and signed checks payable to recruiters.

38.     Examples of its kickback payments include Miromedical's payments to Ashley Khan of almost $100,000 over just an eight-month period in 2015, including:  on January 6, 2015, $4,000; on January 7, 2015, $8,000; on January 8, 2015, $4,000; on January 14, 2015, $4,000; on February 17, 2015, $14,000; on March 31, 2015, $3,000; on April 8, 2015, $11,500; on April 20, 2015, $5,500; on April 27, 2015, $3,000; on May 11, 2015, $5,500; on May 13, 2015, $3,000; on June 8, 2015, $3,000; on June 17, 2015, $4,000; on June 19, 2015, $4,000; on July 22, 2015, $8,650; on July 29, 2015, $3,500; on July 30, 2015, $3,500, $1,650; on August 7, 2015, $3,000; and on August 11, 2015, $3,000.  Documents from Miromedical containing entries

for several of the payments made to Mr. Khan reference "Bowe" (upon information and belief, this refers to Riddick Bowe, since Khan is or was Bowe's boxing manager).

39.     As another example, Miromedical paid Riddick Bowl (who, upon information and belief, is actually Riddick Bowe), more than $60,000 over just a six month period in 2015, including: on March 23, 2015, $3,500; on April 1, 2015, $2,600; April 16, 2015, $6,000; on May 4, $7,500 and $3,500; on May 6, 2015, $3,000; on May 7, 2015, $3,300 and $3,500; on May 13, 2015, $10,000, $2,000, and $2,500; on June 2, 2015, $2,500; on June 19, 2015, $5,000; on July 6, 2015, $3,500, $3,500, and $3,800, on September 2, 2015, $5,000.

40.     Upon information and belief, Riddick Bowe and Ashley Khan owned "Bowe's Fast Food" at 2166 Frederick Douglass Boulevard, which upon information and belief operated on or near the corner of 116th Street in Harlem but which recently closed.

41.     Ashley Khan is also the registered agent for Riddick Bowe Bowejo Carbonated Juicer LLC, located at 201 West 81st Street, Apt. 1R, New York, NY 10024.

42.     Ashley Khan also opened and is the registered agent for Global Humanitarian Consulting Services, Inc. a/k/a Global Humanitarian Medical Services in Harlem at 2738 Frederick Douglass Boulevard, at or near 146th Street in Harlem.  His registered agent address is 201 West 81st Street, Suite 1R, New York, NY 10024.

43.     Miromedical also paid at least $50,000 to Peter Garcia over a nine-month period in 2015, including: on January 7, 2015, $1,000; on January 20, 2015, $1,000; on February 5, 2015, $1,300; on February 17, 2015, $1,300; on March 18, 2015, $1,300; on April 2, 2015, $1,300 and $1,300; on April 27, 2015, $1,300; on May 13, 2015, $1,500; on June 2, 2015, $1,500; on June 11, 2015, $1,500 and $8,000; on June 29, 2015, $1,500; on July 6, 2015, $1,500;

on July 22, 2015, $1,500; on August 7, 2015, $1,500; on August 20, 2015, $1,500; on September 8, 2015, $7,750; on September 23, $6,000; and on September 29, $6,800.

44.     Miromedical paid individual identified as "Waterman" thousands of dollars, including, but, not limited to the following: on January 5, 2015, $622.26; on January 20, 2015, $1,055; on February 17, 2015, $1,188; on April 30, 2015, $1,065.31; and May 28, 2015, $1,221.58.

45.     Additional payments include checks for large sums made out, between April 21 and August 4, 2015, to Rosdo, and between January 13, 2015 and September 25, 2015 to Verado—two businesses run by Dochim—specifically, a total of $400,000 to Rosdo and $120,000 to Verado.  Each of the twenty checks to Rosdo and the eight checks to Verado during these time periods were for the exact amounts of $20,000 and $15,000, respectively.  In addition, with respect to Cure & Care, another business run by Dochim, for every $3,000 of medical equipment that is provided by Cure & Care to patients of Miromedical and that is billed through Medicaid or Medicare, Dochim will return $1,000, thereby according herself a substantial kickback.

46.     As part of its pain management and substance abuse services, Miromedical performs unnecessary in-house urine drug tests on the clients, at a cost many times more expensive (an estimated $120 per test) than the actual cost or in place of other suitable, less expensive, alternative tests.  Miromedical then puts together the bills that are submitted to Medicaid, Medicare, other government programs, and, to a lesser extent, private insurance, for the health care services it provides the clients, including the urine drug tests.  This has occurred for the past five years.

47.     Suboxone® is a combination drug product useful for helping people addicted to opioid drugs to stop using these substances.  The medication includes buprenorphine, classified as a partial opioid agonist, and the antagonist drug naloxone, which counteracts opioid overdose symptoms.  Buprenorphine has a limited opioid effect. While it prevents withdrawal, it causes only mild euphoria compared to the intense euphoria associated with drugs such as oxycodone, morphine and heroin.  The U.S. Food and Drug Administration has approved Suboxone® tablets for long-term maintenance therapy so opioid addicts can resume and maintain normal, productive lives.  Nevertheless, some dangers are linked to Suboxone®.

48.     The New York Times conducted an investigation into Suboxone® use and in 2013 reported that Suboxone® "has attracted unscrupulous doctors and caused more health complications and deaths than advocates acknowledge."  "It has also become a lucrative commodity, creating moneymaking opportunities – for manufacturers, doctors, drug dealers and even patients – that have undermined public health innovation meant for social good."  The Times' investigation further found that "[n]ationally, at least 1,350 of 12,780 buprenorphine doctors have been sanctioned for offenses that include excessive narcotics prescribing, insurance fraud, sexual misconduct and practicing medicine while impaired."

49.     The process used by Miromedical involves a "detox" cycle, which the addict patients face difficult odds of escaping.  The addict patients who come to Miromedical receive either pain management and/or psychiatry services.  They are then usually subject to a detoxification process, which includes placing them on Suboxone® for their addiction problems.  Miromedical bills Medicare for these services and prescriptions.  They then often receive multiple urinalysis tests at excessive cost.  While on Suboxone®, the patients are again referred to pain management and/or psychiatric services, which again leads them to become addicted to

pain or psychiatric medications.  This process then leads to the need for additional detoxification services.  This repeating cycle generates substantial reimbursements for Medicare claims.  Also, Miromedical's patients are often referred to the medical supply businesses run by Dochim, which likewise receive substantial reimbursements through Medicare for the supplies and equipment provided to those patients.  This scheme ensures the Defendants' bilking of Medicare to the greatest extent possible.

50.     Physicians working for Miromedical and who are listed in the Suboxone® Treatment Directory for New York include Drs. Amador, Harhash and Saint Preux.

51.     Relator saw the fraud first-hand as a consultant hired by Dochim to assist her in seeking to obtain the necessary license or certification in order to operate Miromedical as an Article 28 and Part 822 OASAS outpatient substance abuse treatment clinic, pursuant to 14 NYCRR Parts 810, 822 and 853.  Dochim's reliance upon Relator is entirely understandable, given that Relator's experience in, and knowledge of, outpatient substance abuse treatment in New York City is substantial.  He was the sole member and Chief Executive Officer of Narco Freedom, Inc., a not-for-profit corporation that Relator ran in New York State and that provided outpatient programs at ten locations in Brooklyn, Queens, and the Bronx (and which included 18 "Freedom Houses" in the Bronx, i.e., housing offered to individuals seeking or enrolled in Narco Freedom's outpatient programs).  Narco Freedom, created in 1971, was licensed and certified to operate under Article 28 and Part 822 OASAS.  Narco Freedom also provided Suboxone® treatment for addicts.

52.     Scores of patients appear at Miromedical daily to get doses of Suboxone®. Suboxone® is dispensed (and reimbursed by Medicare and other programs) as a safe heroin substitute for people recovering from addiction, to prevent or curb withdrawal effects and calm

cravings.  However, many if not most of the Miromedical patients are or were current addicts who used Suboxone® as a "bridge" between heroin fixes.  The risk of severe negative effects, including overdose, is higher if the patient does not receive enough buprenorphine and continues to take other drugs.  Suboxone® overdose can be fatal, particularly if the patient injects this drug while also taking sedatives, tranquilizers or alcohol.  Unconsciousness, severe respiratory depression and death can occur.  Life-threatening overdose also can result from taking excessive amounts of Suboxone® orally or combining oral Suboxone® with alcohol, sedatives, tranquilizers, certain antidepressants and other opioid medications.

53.     For nearly all patients receiving Suboxone®, Miromedical personnel would systematically create false records as if these patients had received evaluations, counseling, therapy, or medical treatment on the same day that they received their Suboxone®.  For those who did actually receive counseling or treatment, it was unnecessary, unauthorized or, in many cases, counseling sessions were abbreviated, or the medical treatment or psychological "therapy" was incomplete, or the sessions or treatments were reported and billed in amounts far in excess than what actually occurred.

54.     Besides all the "counseling" and "treatment" that Medicare paid for but that was never rendered, or, if it did occur, was reported in excess of what actually occurred, Defendants also caused Miromedical patients to submit to services that were not necessary or authorized but for which Medicare paid.

55.     Additional kickback payments occurred in the form of payments benefiting physicians employed by Miromedical.   For instance, in June and August 2013, and in June 2015, Miromedical paid malpractice insurance for Dr. Clemons Ferrara.  In March, April, June and August 2015, Miromedical paid malpractice insurance for Dr. Felicitas Amador.

56.     Upon information and belief, in connection with Dr. Karl Cirincione, Miromedical disguised kickback payments in the form of payments for "Rent for Podiatry Charge," for July 26, 2013, October 22, 2013, and December 17, 2013 ($2,000, $700, and $1,200, respectively).

57.     Upon information and belief, Miromedical also operates out of, and disguises kickback payments in the form of payments made out to, 903 Sheridan Avenue, Bronx, New York (including $278 on July 22, 2015, $7,750 on August 31, 2015, and $7,500 for a water bill on February 2, 2015).

58.     Physicians representing that they practice at 903 Sheridan Avenue, Bronx, New York include Drs. Amador, Burducea, Cirincione, Clemons Ferrara, Harhash, Saint Preux and Smuglin, as well as physical therapist, Laqui.  This is confirmed by various New York health insurance provider lists, including the MetroPlus Health 2016 Marketplace Plan directory (Bronx County), http://www.metroplus.org/getattachment/ MarketPlace/MP_Marketplace_ Bronx_ Jan2016.pdf.aspx (last visited Mar. 17, 2016); the Empire Winter 2016 Essential Plan directory (New York City), https://mss.empireblue.com/Documents/ NYNY_EP_NYCPD.pdf (last visited Mar. 17, 2016); and the Empire HealthPlus 2015 Medicare-Medicaid directory (Bronx County), https://mss.empireblue.com/Documents/ NYBR_FIDA_PD_ENG.pdf (last visited Mar. 17, 2016).  The Empire Winter 2016 Essential Plan Medicare-Medicaid directory also confirms that Michael Mangoos Physical Therapy, PC, which is a rehabilitation and pain management service and is operated by Dr. Michael Kristian Trangia Mangubat, M.D., operates out of 903 Sheridan Avenue.

59.     Even though it operates on the surface as an "822" OASAS licensed or certified substance abuse treatment facility (i.e., licensed or certified by the New York Office of

Alcoholism and Substance Abuse Services), and as a Public Health Law Article 28 licensed diagnostic and treatment center, Dochim's scheme through Miromedical circumvents compliance with the "822" OASAS and Article 28 credentialing, licensing, and operating certification requirements of the New York State Office of Alcoholism and Substance Abuse Services.  14 NYCRR Part 810, 822, and 853.   Though Dochim partners with physicians through Miromedical as part of the scheme, and obtains reimbursement through Medicare payments that are directed to the physicians through HMOs (approximately 50% of such payments), she is prohibited by law from partnering with physicians and obtaining such reimbursements because Miromedical lacks the required license, credentials or certification under 14 NYCRR Parts 810, 822 and 853.

60.     Because Dochim does not operate a legitimate or actual 822 and Article 28 organization, she needs a mechanism that will divert physician's revenues (including from Medicare and Medicaid) to her.  As such, she improperly bills the physicians used by Miromedical (or one of her medical supply businesses) at an artificially high rate (not a market rate, which is required by the applicable regulations).  Dochim also improperly charges physicians a management fee and for office space, repairs, entertainment, and other management services to absorb the bulk of the fees reimbursed to physicians.  This is in effect an illegal kickback scheme disguised in the form of management fees.  In this regard, Dochim circumvents the requirements governing 822 and Article 28 organizations and, as discussed below, the New York FCA.

61.     Defendants' scheme also violates New York Public Health Law § 2811, New York Education Law § 6530(19), and 8 NYCRR § 29.1(b)(4), insofar as these provisions prohibit fee splitting between physicians and non-physicians.  In this regard, an Article 28

facility may lawfully share the fees generated by it with its physician-employees for services they provide within the scope of the facility's operating certificate.  But as noted above, Miromedical never obtained an operating certificate as required by New York law, and hence Miromedical lacks the legal authorization to split fees generated by its physician-employees. Hence, by billing physicians associated with Miromedical or one of Dochim's medical supply businesses at an artificially high rate, and/or covering various management services, and sharing revenues with the Defendants, the Defendants engage in illegal fee splitting.

62.     Miromedical's federal income tax return for 2013 states that it received $3,846,000 in total income that year.   For 2014, its federal return reflects receipt of $2,902,000 in total income.

## IV.    JURISDICTION, VENUE, AND SPECIAL REQUIREMENTS

63.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular, the False Claims Act, 31 U.S.C. § 3729, et seq.

64.     This action also arises under the federal Anti-Kickback Statute, which prohibits the exchange (or offer to exchange), of anything of value, in an effort to induce (or reward) the referral of federal health care program business.  42 U.S.C. § 1320a-7b.

65.     In addition, the FCA specifically confers jurisdiction upon United States district courts under 31 U.S.C. § 3732.  This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants maintain offices and conduct business in the Southern District of New York.

66.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because acts complained of herein occurred in the Southern District of New York.

67.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because the False Claims Act authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

68.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed in camera and will remain under seal for a period of at least 60 days, and shall not be served on the Defendants until the Court so orders.

69.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Complaint upon the Honorable Preet Bharara, United States Attorney for the Southern District of New York, and upon the Honorable Loretta Lynch, Attorney General of the United States.

70.     Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" since he has voluntarily provided his information to the Government before filing this Complaint, and has knowledge which is both direct and independent of, and materially adds to, any public disclosures to the extent they may exist.

## V.     THE PARTIES

71.     Plaintiff/Relator Alan Brand is a resident of Melville, New York.  He is, and at all times relevant to this Complaint was, a resident of New York State.  Relator was until approximately July 2014 the Chief Executive Officer and sole member of Narco Freedom, a not-

for-profit corporation that provided outpatient programs for chemically-dependent individuals at various locations in Brooklyn, Queens, and the Bronx.   The allegations of this Complaint are based upon the personal knowledge of Relator, unless otherwise described as made upon information and belief.  Relator is the original source of the factual allegations of this Complaint within the meaning of FCA.

72.     Defendant Miromedical advertises itself as a Family Medicine Doctor primarily specializing in Family Medicine and Allergy & Immunology.   It was incorporated in New York on September 9, 2010 and its principal and registered agent is Lawrence T. Chiaramonte.    Its principal place of business is at 2364 Frederick Douglass Boulevard, New York, New York 10027.

73.     Defendant Lawrence T. Chiaramonte, MD (NPI No. 1699885327), is the principal and registered agent for Miromedical.  His address is 170 West 233rd Street, Bronx, New York 10463.

74.     Defendant Natalia Dochim is the Director or Manager of Miromedical.  She is a resident of Brooklyn, New York.

75.     Dr. Amador (NPI No. 1124031265) specializes in internal medicine, addiction medicine, and psychiatry.  She is listed as employed at Miromedical's group practice location at 2364 Frederick Douglass Boulevard, Bronx, New York.  She also has an office at 253 Third Avenue, New York, New York.

76.     Dr. Burducea (NPI No. 1891959052) specializes in pain management and has a business address at 5500 Merrick Road, Massapequa, New York.

77.     Dr. Cirincione (NPI No. 1295818706) specializes in podiatry.  He completed his undergraduate degree at Queens College and his podiatry degree at New York College of

Podiatric Medicine. He completed his residency at Wyckoff Heights Medical Center and St. Barnabas Hospital.  He is listed as employed at Miromedical's group practice location at 2364 Frederick Douglass Boulevard, Bronx, New York.  He also has an office at 154 W 127th St, New York, New York.

78.     Dr. Dorsten (NPI No. 1477590396) specializes in diagnostic radiology.  He is listed as employed at Miromedical's group practice location at 2364 Frederick Douglass Boulevard, Bronx, New York.  He also has an office at 1042 Flatbush Ave #7, Brooklyn, NY 11226 and at 666 Greenwich Street, Apr. #843, New York, New York.

79.     Dr. Clemons-Ferrara (NPI 1265659916) specializes in family and emergency medicine and has business addresses of 89 Castle Hill Road, Pawcatuck, CT, 9 Castle Hill Road, Pawcatuck, CT, and 903 Sheridan Avenue, Bronx, NY.  Clemons-Ferrara is also listed as president of Ferrara Medical Care, P.C. (NPI 1467795880), which is located at 1957 Southern Boulevard, Bronx, New York.  Ferrara Medical Care employs physicians associated with Miromedical, including Defendants Laqui, Cirincione, and Smuglin.  By Order dated September 16, 2009, the State of Connecticut rejected Clemons-Ferrara's application to practice medicine in that state on the ground that she had falsely represented herself as authorized to practice medicine in that State when in fact she had not been licensed to do so.  The Order imposed a penalty of $500 and required that upon the issuance of any license to Clemons-Ferrara to practice medicine in Connecticut, it would be immediately reprimanded and placed on probation for a six month period, during which time she would be required to take a course in professional medical ethics.

80.     Dr. Harhash (NPI No. 1750399523) specializes in physical medicine, rehabilitation and pain management pain medicine, and has a business address of 2320 Broadway, Astoria, New York.

81.     Jonathan Laqui (NPI No. 1538480421) is a physical therapist with business addresses of 4405 Broadway, New York, NY, and 3039 Ocean Parkway, Brooklyn, New York.

82.     Majumder R. Mujibur, MD (NPI 1316988165) specializes in sleep medicine and pulmonary disease, and has a business address at 9413 Flatlands Ave., #205W, and One Brookdale Plaza, in Brooklyn, New York.

83.     Dr. Saint Preux (NPI No. 1245278878) specializes in neurology and psychiatry. His business addresses are 8906 135th Street, Suite 7-L, Jamaica, New York, and 1 Brookdale Plaza, 12th Floor, Brooklyn, New York.

84.     Dr. Smuglin (NPI No. 1265484802) specializes in internal medicine and addiction medicine, and has an address at 392 Bedford Park Boulevard, Bronx, NY 10458-2415.  He is also the Director of 1957 Bronx Medical, P.C., located at 9924 64th Avenue, Rego Park, NY 11374-2645.  As set forth by the New York Department of State records, Natalia Dochim at 2364 Frederick Douglass Boulevard, Suite 2, is listed in the entity address for service of process by the New York Department of State upon 1957 Bronx Medical P.C.

85.     Sandy Weekes (NPI No. 1316221237) is a nurse practitioner and clinical nurse specialist.  Her business address is 2364 Frederick Douglass Boulevard, Bronx, New York.

## VI.     GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A.     The False Claims Act

86.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to

recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

87.     The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A), (B), (G).  Any person found to have violated these provisions or conspired to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

88.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b)(1).

89.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor,

grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

90.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

91.     In this action, and under well-established precedent, the false or fraudulent nature of Defendant's conduct is informed or measured by its violation of, or failure to comply with, certain statutes and regulations material to governing: requirements that manufacturers must meet in order for medical procedures conducted using their equipment to qualify for reimbursement under government-funded assistance programs such as Medicare and Medicaid; and requirements that manufacturers must meet in order for medical procedures conducted using their equipment to qualify for payment under government-funded healthcare programs such as FEHBP and TRICARE.

B.     **Federal Government-Funded Health Assistance Programs**

1.     **Medicare**

92.     Medicare is a federal government-funded medical assistance program, primarily benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq.  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").

### 2.      Medicaid

93.      The Medicaid program was created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the medically needy aged, the blind, the disabled, and needy families with dependent children.  42 U.S.C. §§ 1396-1396v.  The Medicaid program is funded by both federal and state monies, (collectively referred to as "Medicaid Funds"), with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b, 1396d(b).  At the federal level, Medicaid is administered by CMS. Medicaid is used by 49 states, each of which has a state Medicaid agency to administer the program.

94.      Each state is permitted, within certain parameters, to design its own medical assistance plan, subject to approval by the HHS.  Among other forms of medical assistance, the states are permitted to provide medical assistance from the Medicaid Funds to eligible persons for diagnostic procedures.  42 U.S.C. § 1396a(10)(A), 1396d(a)(12).

### 3.      General Provisions Applicable to Medicare

#### a.      The Anti-Kickback Statute Ensures Integrity of Underlying Conduct.

95.      The Anti-Kickback Statute prohibits kickbacks by providing a civil monetary penalty of $50,000 for each act by an individual or entity that violates 42 U.S.C. § 1320a-7a(a)(7), which defines "[i]mproperly filed claims" as "[a]ny person (including an organization, agency, or other entity . . .) that . . . commits an act described in paragraph (1) or (2) of section" 1320a-7b(b) of this title.  The statute defines "illegal remuneration" (i.e., kickbacks) as:

> (1)      Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

\* \* \*

    (B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

\* \* \*

    (2)    Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

\* \* \*

    (B)    to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

42 U.S.C. § 1320a-7b(b) (emphasis added).  The offense is also a felony punishable by fines of up to $25,000 and imprisonment for up to five years.  42 U.S.C. § 1320a-7b(b).

96.    In accordance with the Anti-Kickback Statute, Medicare regulations prohibit waivers of copayments without evidence of financial need and inducements, such as free goods or services, that incentivize patients to order more Medicare approved services.  Such waivers and free goods and services amount to kickbacks and can increase the expenditures paid by Government-funded health benefit programs by leading to overutilization of services and inducing medically unnecessary and excessive reimbursements.  Kickbacks also effectively reduce patients' healthcare choices, because unscrupulous providers steer patients to various products based on the providers' own financial interests rather than the patients' medical needs.

97.    The Anti-Kickback Statute contains statutory exceptions and regulatory "safe harbors" excluding certain types of conduct from liability.  See 42 U.S.C. § 1320a-7b(b)(3) and 42 C.F.R. § 1001.952.  None of these statutory exceptions or regulatory safe harbors applies to Defendants' conduct in this matter.

98.     The Medicare and Medicaid Patient and Program Protection Act of 1987 authorizes the exclusion of an individual or entity from participation in the Medicare and Medicaid programs if it is determined that the party has violated the Anti-Kickback Statute.  In addition, the Balanced Budget Act of 1997 amended that Act to impose administrative civil monetary penalties for Anti-Kickback Statute violations: $50,000 for each act and an assessment of not more than three times the amount of remuneration offered, paid, solicited or received, without regard to whether a portion of such remuneration was offered, paid, solicited or received for a lawful purpose.  See 42 U.S.C. § 1320a-7a(a)(7).

99.     The Government has deemed such misconduct to be material to its decision to pay healthcare claims, in part through its requirement that providers certify compliance with this law as a condition of payment under, and participation in, Government healthcare programs.  If the Government had been aware that orders were placed as a result of such prohibited conduct, the Government would not have paid the claims submitted as a result of Defendants' wrongdoing.

### b.     The Stark Law

100.     The Stark Law, 42 U.S.C. § 1395nn(a), prohibits physician self-referrals for certain designated services, if those services are subject to reimbursement from Medicare or Medicaid.  "In an effort to contain health care costs and reduce conflicts of interest, Congress passed legislation in 1989 and 1993 that prohibits physicians from referring their Medicare and Medicaid patients to business entities in which the physicians or their immediate family members have a financial interest." Fresenius Med. Care Holdings, Inc. v. Tucker, 704 F.3d 935, 937 (11th Cir. 2013).

101.     The Stark Law's prohibition applies only if the physician has a "financial relationship" with the entity that receives the referral. 42 U.S.C. § 1395nn(a)(1). A "financial

relationship" can include "a compensation arrangement ... between the physician ... and the entity" that receives the referral. 42 U .S.C. § 1395nn(a)(2)(B); see also 42 U.S.C. § 1395nn(h)(1)(A) ("The term 'compensation arrangement' means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C).").

102.    A "referral" includes, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare...." 42 C.F.R § 411.351.  A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." Id.

103.    While a "compensation arrangement" is required for a Stark Law violation, a bona fide employer exception applies if the physician is employed for identifiable services, receives compensation consistent with fair-market value and the arrangement is "commercially reasonable." 42 U.S.C. § 1395nn(e)(2)(B)-(C).

104.    Physician compensation may not be based on the "volume or value" of physician referrals. Id. § 1395nn(e)(2)(B)(iii); 42 C.F.R. § 411.351. The definition of "referrals" also excludes "any designated health service personally performed or provided by the referring physician." 42 C.F.R. § 411.351.

105.    Claims submitted in violation of the Stark Statute are ineligible for payment, and violate material conditions of payment of federal healthcare programs.

106.    A claim for payment that is based on a violation of the Stark Statute constitutes a false claim under the FCA.

      c.      **New York State Laws and Regulations Governing the Provision of Addiction Treatment.**

107.    New York State law, and OASAS regulations, impose detailed requirements on the provision of addiction treatment, including the credentialing of addiction counselors and other providers, and the creation and maintenance of patient records.

108.    Pursuant to regulations (Official Compilation of Codes, Rules and Regulations of the State of New York, Title 14, Ch. XXI § 853.5), for a clinic to admit a patient to a methadone program, it must, in substance and relevant part:

    a.    Take a complete medical history and assess mental status;

    b.    Conduct a comprehensive medical exam and administer specific laboratory tests;

    c.    Have an addiction counselor, social worker or licensed medical professional conduct an intake interview;

    d.    Obtain a signed consent form;

    e.    Prepare a complete, narrative psychosocial history (within 30 days of admission) which includes a psychosocial diagnosis

    f.    Develop a treatment plan which includes

        i.    Long- and short-term goals for treatment generated by both staff and patient;

        ii.    Assignment of a primary counselor;

        iii.    Description of the type and frequency of counseling to be provided each week; and

        iv.    Description of the supportive services, particularly the educational or vocational services or alcoholism or mental health services or alcoholism or mental health services needed by the patient and a plan for meeting those needs. The treatment plan shall be prepared and documented in the patient record within 30 days of each admission, and reviewed, together with progress in treatment, by a person competent to devise such a plan, no less frequently than

> every 90 days during the first year of treatment, and every six months thereafter.

    g.    Orient the patient to the demands and responsibilities of methadone treatment; and

    h.    Provide the patient with a copy of a statement of patients' rights, and a copy of program rules and regulations, and discussion of them with the patient.

109.    Pursuant to regulations (Official Compilation of Codes, Rules and Regulations of the State of New York, Title 14, Ch. XXI § 828. 7), a clinic need not repeat the procedures required for initial admission is a patient is seeking re-admission into the same program within three months after discharge, unless otherwise directed by a physician.

110.    Pursuant to regulations (Official Compilation of Codes, Rules and Regulations of the State of New York, Title 14, Ch. XXI § 828.17), a clinic must maintain specific categories of patient records, including:

    a.    An initial interview report, including residence, family relationships and attitudes, educational and vocational history, data on military service if any, legal record, history of substance abuse and treatment, intake worker's impressions and recommendations for immediate and long-range treatment;

    b.    The patient's narrative psychosocial history;

    c.    Medical reports, lab reports, and progress notes, including dosage information, to be entered by physicians or other licensed professional medical staff;

    d.    Dated case entries of all significant contact with patients, including a record of each clinic visit in chronological order;

    e.    Date and results of case conferences for patients;

    f.    The patient's treatment plan, including amendments, reviews, and updates, and semiannual progress reports including an evaluation of the existing treatment plan and the patient's response to treatment; and

g.      Documentation that the patient was provided with a copy of the program's rules and regulations and a statement of the patient's rights and that such were discussed with him.

111.    Pursuant to regulations (Official Compilation of Codes, Rules and Regulations of the State of New York, Title 14, Ch. XXI § 828.15), each clinic must be staffed with no less than:

a.      One full-time physician and two full-time nurses (or the equivalent thereof) per 300 patients (physician's assistance and nurse practitioners may supplement this requirement);

b.      A full-time administrator-supervisor for clinics with more than 100 patients capacity;

c.      At least one full-time caseworker (or the equivalent thereof) for every 50 patients.

112.    Pursuant to regulations (Official Compilation of Codes, Rules and Regulations of the State of New York, Title 14, Ch. XXI § 822-3.1(h)(7)), counseling must be conducted face-to-face with the patient, and must be of a minimum duration as follows:

a.      For a "brief" session, at least 25 minutes of face-to-face contact with the patient;

b.      For a "normative" session, at least 45 minutes of face-to-face contact with the patient;

c.      For group therapy, at least 60 minutes of face-to-face contact with the patient(s);

d.      For an "extensive" session, at least 75 minutes of face-to-face contact with the patient.

113.    Federal and New York law requires providers who bill Medicare and Medicaid to certify that they have established and implemented compliance programs, and that they are in compliance with applicable law, as a precondition for submitting claims for reimbursement to these programs.  See NYS OMIG CCDRA2012 (Form to Certify Compliance with Deficit

Reduction Act of 2005); see also N.Y. State Social Services Law § 363-d &18 N.Y.C.R.R. Part 521.

### d.   Prohibitions Against Claims for Services that are Not Medically Necessary or are Otherwise False or Fraudulent

114.    Federal law prohibits a person from knowingly presenting or causing to be presented to Medicare or Medicaid a claim for a medical or other item or service that the person knows or should know was "not   provided as claimed," a claim for such items or services that is "false or fraudulent," or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E).  Violation of this section is subject to a civil monetary penalty of $10,000 for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs.

## VII.   THE GOVERNMENT HAS BEEN DAMAGED AS A RESULT OF DEFENDANTS' CONDUCT

115.    As a direct and intended result of their fraud, Defendants have submitted, and caused Miromedical to submit, thousands of false claims for reimbursement from Medicare over the years of Miromedical's existence, including the time period covered by this Complaint and within the applicable statutes of limitations.

116.    Defendants have also committed violations of the AKA by paying "runners" or "recruiters" to steer patients to Miromedical and bribing patients with cash and other inducements (such as food and pain medications) to come to Miromedical to sign up as patients and to receive services, real or fabricated.  These kickbacks have tainted the services provided by Miromedical and reimbursed by federal health insurance programs, including Medicare.  Both expressly and implicitly, Defendant Miromedical certifies to the New York State Government

that it is in compliance with all applicable healthcare laws and regulations, including the AKA. However, by knowingly and willfully bribing people to sign up as patients and clients of Miromedical, the Defendants are paying kickbacks in violation of the AKA.

117.    As alleged previously herein, Defendants routinely billed for services that had not been performed, or had been incompletely performed, or were unnecessary, based on documentation that falsely showed that services had been fully performed or were necessary. Among other things, Defendants falsely billed Medicare for treatment plans; psychosocial evaluations and urine drug tests.  Defendants also billed Suboxone® treatments, as well as the other services provided at Miromedical, that were provided to patients who had been recruited by use of illegal cash kickback payments.

118.    Relator estimates that Miromedical has a population of approximately 60-65 patients on every day that it operates.  But that amount is extremely excessive for the size of the clinic and the number of medically-qualified staff members available on any given day, and results in excessive billing and claims to Medicare.   Miromedical operates not as a responsible and authorized substance abuse treatment center, but essentially as a "script mill," which unlawfully sells prescriptions for controlled substances.  The majority of patients are walk-ins off the street who have not been referred by a primary care physician or a family doctor, which is unusual because Miromedical specializes in a pain management practice.  Further, the number of Suboxone® prescriptions written by physicians employed by, or associated with, Miromedical tremendously exceeds the caps that are placed on the physicians.  They are limited to one hundred Suboxone® patients, which should result in approximately 1500 prescriptions a year, on the high side.  Yet, upon information and belief, some of the physicians are writing in excess of ten thousand prescriptions a year.

119.    As part of the scheme discussed above, Miromedical submitted false claims to the Federal Medicare Program for services provided by Miromedical and the physicians it employed for patients and that were paid for by Medicare.  For example, as a direct and intended result of Defendants' kickback scheme, Sandy Weekes in  2013 billed Medicare for 65 procedures, called "subsequent nursing facility visit, typically 10 minutes per day," and for which she sought approximately $4,875.00 in Medicare reimbursements, and received approximately $2,117.70 in such reimbursements.  In 2013, she also billed Medicare for 35 procedures, called "subsequent nursing facility visit, typically 15 minutes per day," and for which she sought approximately $4375.00 in Medicare reimbursements, and received approximately $1776.25 in such reimbursements.

120.    In addition, as part of the scheme discussed above, Miromedical received millions of dollars in Medicare and Medicaid reimbursements as a result of its presentment of, or causing the presentment of, false claims to the Federal and New York State Governments.  Examples of these payments included:  on January 20, 2015, $15,504.50 from Medicaid (Healthfirst Phsp), $2,196.98 from Medicare (Managed Health); on January 26, 2015, $21,399.51 from Medicaid (Healthfirst Phsp), and $2,528.29 from Medicare (Managed Health); on February 2, 2015, $23,722.55 from Medicaid (Healthfirst Phsp), $2,438.81 from Medicare (Managed Health); on February 9, 2015, $11,178.96 from Medicaid (Healthfirst Phsp), $2,107.79 from Medicare (Managed Health); on February 17, 2015, $9,724.08 from Medicaid (Healthfirst Phsp), $1,503.42 from Medicare (Managed Health); on February 23, 2015, $18,352.94 from Medicaid (Healthfirst Phsp), $1,629.07 from Medicare (Managed Health); on March 2, 2015, $19,699.64 from Medicaid (Healthfirst Phsp), $1,345.34 from Medicare (Managed Health); on March 9, 2015, $14,233.40 from Medicaid (Healthfirst Phsp), $1,205.63 from Medicare (Managed

Health); on March 16, 2015, $10,107.90 (Healthfirst Phsp), $1,205.63 from Medicare (Managed

Health); on March 23, 2015, $34,439.24 from Medicaid (Healthfirst Phsp), $5,721.25 from

Medicare (Managed Health); on April 6, 2015, $12080.24 from Medicaid (Healthfirst Phsp),

$1,473,92 from Medicare (Managed Health); on April 13, 2015, $18,472.59 from Medicaid

(Healthfirst Phsp), $1,625.70 from Medicare (Managed Health); on April 20, 2015, $19,065.13

from Medicaid (Healthfirst Phsp), $1,344.78 from Medicare (Managed Health); on April 27,

2015, $17,743.54 from Medicaid (Healthfirst Phsp), $2,301.06 from Medicare (Managed

Health); on July 3, 2015, $5,211.62 from Medicaid (Healthfirst Phsp), $778.83 from Medicare

(Managed Health); on July 13, 2015, $4,108.11 from Medicaid (Healthfirst Phsp), $547.98 from

Medicare (Managed Health); on August 3, 2015, $13,329.31 from Medicaid (Healthfirst Phsp),

$2,415.49 from Medicare (Managed Health); on August 10, 2015, $4,031.17 from Medicaid

(Healthfirst Phsp), $124.23 from Medicare (Managed Health); on August 17, 2015, $17,374.68

from Medicaid (Healthfirst Phsp), $1,975.61 from Medicare (Managed Health); on August 24,

2015, $4,756.99 from Medicaid (Healthfirst Phsp), $674.41 from Medicare (Managed Health);

and on August 31, 2015, $421.16 from Medicaid (Healthfirst Phsp), $60.00 from Medicare

(Managed Health).

121.    Based on these numbers, Relator estimates that Defendants' unlawful scheme has

caused the Federal Government to be defrauded of millions in taxpayer funds.

## VIII.  CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**(False Claims Act: Presentation of False Claims)**
**(31 U.S.C. § 3729(a)(1)(A))**

122.    Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 115 of this Complaint as if fully set forth herein.

123.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

## SECOND CAUSE OF ACTION
**(False Claims Act: Making or Using False
Record or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(1)(B))**

124.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 117 of this Complaint as if fully set forth herein.

125.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

## THIRD CAUSE OF ACTION
### (False Claims Act: Making or Using False Record Or Statement to Avoid an Obligation to Refund) (31 U.S.C. § 3729(a)(1)(G))

126.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 119 of this Complaint as if fully set forth herein.

127.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements—i.e., the false certifications made or caused to be made by Defendants—material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

## FOURTH CAUSE OF ACTION
### (False Claims Act: Conspiracy) (31 U.S.C. § 3729(a)(1)(C))

128.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 121 of this Complaint as if full set forth herein. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants knowingly conspired, and may still be conspiring, with health care professionals identified and described herein to present, or cause to present, false claims and payment thereof.  Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

## FIFTH CAUSE OF ACTION
### (Violations of Anti-Kickback Statute)
### (42 U.S.C. § 1320a-7a)

129.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 122 of this Complaint as if fully set forth herein.

130.    By engaging in the conduct described in the foregoing Paragraphs, Defendants have violated 42 U.S.C. §1320a-7a and 42 C.F.R. 1001.952(f).

131.    In particular, Defendants have knowingly submitted claims to the United States Government and to Medicare as a result of the payment of the above-described kickbacks.  The payment of kickbacks to induce purchases constitutes remuneration to increase the level of business in violation of the anti-kickback statute.

132.    As a result of the conduct set forth in this cause of action, the Government suffered harm as a result of paying or reimbursing for medical supplies which, had the Government known such medical supplies were purchased as a result of kickbacks, the Government would not otherwise have paid for and/or reimbursed.

## IX.    DEMANDS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States  demands judgment against the Defendants, ordering that:

a.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions which Relator currently estimates to be in the hundreds of millions of dollars, plus a civil penalty of not less than $6,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, et seq; and $50,000 for each violation of 42 U.S.C. § 1320a-7a(a)(7) of the Medicare/Medicaid Anti-Kickback Statute;

b.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

      c.     Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(o) and any other applicable provision of the law; and

      d.     Relator be awarded such other and further relief as the Court may deem to be just and proper.

**TRIAL BY JURY**

    Relator hereby demands a trial by jury as to all issues.

<b>SEEGER WEISS LLP</b>

By: _____
          Stephen A. Weiss
          James A. O'Brien
          77 Water Street
          New York, NY 10005

          Michael F. Bachner
          Bachner & Associates PC
          39 Broadway, Suite 1610
          New York, NY  10006

          *Attorneys for Plaintiff/Relator*

Dated:  June 24, 2016